J-A13012-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: T.R.B., A MINOR  IN RE: ADOPTION OF: TR.H.B., A MINOR  IN RE: ADOPTION OF: T.H.B., A MINOR | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: K.P., MOTHER | : : : : | |
| | : | No. 53 WDA 2024 |

Appeal from the Order Entered December 15, 2023
In the Court of Common Pleas of Blair County Orphans' Court at No(s):
2023 AD 7,
2023 AD 7A, 2023 AD 7B

BEFORE:  OLSON, J., SULLIVAN, J., and BENDER, P.J.E.

MEMORANDUM BY OLSON, J.:                    **FILED: June 28, 2024**

Appellant, K.P., ("Mother") appeals from the December 15, 2023 order entered in the Court of Common Pleas of Blair County that denied Mother's petitions for involuntary termination of the parental rights of T.B. ("Father"), the biological father of TR.H.B., a male child born in July 2011, T.R.B., a female child born in October 2012 , and T.H.B., a male child born in February 2014, (collectively, "the children").  Mother's petitions for involuntary termination of Father's parental rights to the children were filed pursuant to Section 2512 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938.[1]  We affirm.

---

[1] Section 2512 provides that "[a] petition to terminate parental rights with respect to a child under the age of 18 years may be filed by [e]ither parent when termination is sought with respect to the other parent."  23 Pa.C.S.A. § 2512(a)(1).

The record demonstrates that on February 14, 2023, Mother filed a petition for involuntary termination of Father's parental rights to T.R.B. at orphan's court docket number 2023 A.D. 7. That same day, Mother filed a petition for involuntary termination of Father's parental rights to TR.H.B. at orphan's court docket number 2023 A.D. 7A and a petition for involuntary termination of Father's parental rights to T.H.B. at orphan's court docket number 2023 A.D. 7B.[2]

_____

[2] In her three petitions for involuntary termination of Father's parental rights, Mother averred,

> A.  [Father] has not seen the minor [children] or had any contact with the minor [children] whatsoever for a period which exceeds six months.
>
> B.  [Father] has failed to perform any parental duties in connection with the subject child for a period which exceeds six months.

Petition for Involuntary Termination of Parental Rights as to T.R.B. (2023 A.D. 7), 2/14/23, at ¶7; *see also* Petition for Involuntary Termination of Parental Rights as to TR.H.B. (2023 A.D. 7A), 2/14/23, at ¶7; Petition for Involuntary Termination of Parental Rights as to T.H.B. (2023 A.D. 7B), 2/14/23, at ¶7. Although Mother's petitions for involuntary termination of Father's parental rights do not cite a specific provision of Section 2511 of the Adoption Act under which Mother sought involuntary termination of Father's parental rights, based upon Mother's pleadings, Mother sought termination of Father's parental rights under Section 2511(a)(1) and (b) of the Adoption Act, as discussed in greater detail *infra*. **See** 23 Pa.C.S.A. § 2511(a)(1) and (b).

On February 14, 2023, Mother and stepfather, D.M., ("Stepfather") filed a corresponding petition for adoption with each petition for involuntary termination of Father's parental rights.

On February 16, 2023, the trial court appointed James V. McGough, Esquire ("Attorney McGough") as guardian *ad litem* to represent the best interests of the children. On April 19, 2023, the trial court appointed Maryann Joyce Bistline, Esquire ("Attorney Bistline") to represent Father. On April 21, 2023, the trial court appointed Traci Naugle, Esquire ("Attorney Naugle") as counsel to represent the legal interests of the children. Mother and Stepfather are represented by John D. Sisto, Esquire ("Attorney Sisto"). A termination hearing was conducted on June 30, 2023, and continued on September 26, 2023, at which Attorney Sisto, Attorney Bistline, Attorney McGough, and Attorney Naugle, as well as Mother, Stepfather, Father, Father's sister, and the children, participated.

On December 15, 2023, the trial court denied Mother's petitions for involuntary termination of Father's parental rights to the children. This appeal followed.[3]

_____

[3] We note that, on January 8, 2024, Mother filed a notice of appeal at each of the three trial court dockets. Each notice of appeal listed all three trial court docket numbers. Pursuant to Pennsylvania Rule of Appellate Procedure 341, when a single order "resolves issues arising on more than one docket[,] separate notices of appeal must be filed." Pa.R.A.P. 341 at *Official Comments*; *see also Commonwealth v. Walker*, 185 A.3d 969, 977 (Pa. 2018), *overruled in part by Commonwealth v. Young*, 265 A.3d 462, 477 and n.19 (Pa. 2021) (reaffirming *Walker* but holding that Pennsylvania Rule of Appellate Procedure 902 permits an appellate court, in its discretion, to allow correction of a Rule 341 error); *see also* Pa.R.A.P. 902(a) (effective May 18, 2023) (stating, "[a] notice of appeal must be filed in each docket in which the order has been entered"). This Court recently held that it is of no consequence that a notice of appeal contains more than one trial court docket number, so long as the party files a notice of appeal at each of the trial court dockets.

Mother raises the following issues for our review:

1.    [Whether] the trial court erred as a matter of law in finding [Mother] had not proven by clear and convincing evidence that [Father] evidenced a settled purpose of relinquishing parental claim to the children or that he refused or failed to perform parental duties under 23 Pa.C.S.A [§] 2511(a)(1)[?]

2.    [Whether] the trial court's findings that [Father] filed multiple custody petitions in 2023 prior to the filing of the petition[s] for involuntary termination of parental rights is not supported by the record and the [trial] court's reliance upon that assertion in denying [Mother's] request [constitutes an] error of law[?]

3.    [Whether] the trial court's mechanical interpretation of 23 Pa.C.S.A. [§] 2511(a)(1) finding that a single petition for contempt filed two weeks prior to the filing for [involuntary] termination of parental rights is sufficient to overcome several months of failing to or refusing to perform parental duties [constitutes] an error of law and an abuse of discretion[?]

4.    [Whether] the trial court failed to consider the best interests of the minor children and the negative effect the denial of

_____

*Commonwealth v. Johnson*, 236 A.3d 1141, 1148 (Pa. Super. 2020) (*en banc*), *appeal denied*, 242 A.3d 304 (Pa. 2020); *see also Commonwealth v. Larkin*, 235 A.3d 350, 352 (Pa. Super. 2020) (*en banc*), *appeal denied*, 251 A.3d 773 (Pa. 2021). In other words, for purposes of perfecting an appeal, this Court is concerned that a notice of appeal is filed at each trial court docket, not whether the notice of appeal contains more than one trial court docket number.

Here, the record reveals that Mother filed a notice of appeal at all three trial court dockets. The complete records of each trial court docket were then forwarded to this Court for purpose of the appeal. This Court assigned only one docket number to Mother's three appeals. Based upon our review of Rule 341, Rule 902, *Walker*, and its progeny, we conclude that Mother perfected three appeals from the December 15, 2023 order entered at each trial court docket.

[involuntary] termination of parental rights of [Father] will have on the intact family the children have known for years[?]

Mother's Brief at 6-7.[4]

Mother's issues collectively challenge the trial court's order denying her petitions for involuntary termination of Father's parental rights to the children. In matters involving involuntary termination of parental rights, our standard of review is well-settled.

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. This standard of review corresponds to the standard employed in dependency cases, and requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but it does not require the appellate court to accept the [trial] court's inferences or conclusions of law. That is, if the factual findings are supported, we must determine whether the trial court made an error of law or abused its discretion. An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion[. W]e reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill[-]will. Thus, absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. We have previously emphasized our deference to trial courts that often have first-hand

_____

[4] Both Mother and the trial court complied with Pennsylvania Rule of Appellate Procedure 1925. In its Rule 1925(a) opinion (which was filed in the form of a letter directed to the prothonotary of the Court of Common Pleas of Blair County), the trial court indicated that the jurist who presided over the termination hearing and issued the December 15, 2023 order denying Mother's petitions for involuntary termination of Father's parental rights "completed her service for which she was appointed on December 31, 2023." The trial court further indicated that it was relying on the opinion that accompanied the December 15, 2023 order.

observations of the parties spanning multiple hearings. However, we must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

***In re Adoption of C.M.***, 255 A.3d 343, 358-359 (Pa. 2021) (citations, original brackets, and quotation marks omitted). "[T]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." ***In re Q.R.D.***, 214 A.3d 233, 239 (Pa. Super. 2019) (citation omitted). "If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." ***In re B.J.Z.***, 207 A.3d 914, 921 (Pa. Super. 2019) (citation omitted).

The termination of parental rights is guided by Section 2511 of the Adoption Act, which requires a bifurcated analysis of the grounds for termination followed by an assessment of the needs and welfare of the child.

Our case law has made clear that under Section 2511, the [trial] court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the [trial] court determines that the parent's conduct warrants termination of his or her parental rights does the [trial] court engage in the second part of the analysis pursuant to Section 2511(b)[ - ]determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*B.J.Z.*, 207 A.3d at 921 (citation omitted). Section 2511 requires clear and convincing evidence to support the grounds for termination, which we have defined as proof that is "so clear, direct, weighty, and convincing as to enable the trier[-]of[-]fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re Z.P.*, 994 A.2d 1108, 1116 (Pa. Super. 2010) (citation omitted). A child has a right to a stable, safe, and healthy environment in which to grow, and the "child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *In re I.J.*, 972 A.2d 5, 9 (Pa. Super. 2009).

Here, Mother sought involuntary termination of Father's parental rights to the children pursuant to Section 2511(a)(1). Section 2511(a)(1) states that,

### § 2511. Grounds for involuntary termination

**(a) General rule.** - The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S.A. § 2511(a)(1).

"A court may terminate parental rights under Section 2511(a)(1) where the parent demonstrates a settled purpose to relinquish parental claim to a child **or** fails to perform parental duties for at least the six months prior to the

filing of the termination petition." ***Z.P.***, 994 A.2d at 1117 (emphasis in original). Recently, our Supreme Court, in ***C.M.***, ***supra***, reiterated the well-established principle that "a child has a right to essential parental care" and that, although the Adoption Act does not provide a strict definition of "parental duty" there are "certain irreducible qualities of a parent's attendant obligation." ***C.M.***, 225 A.3d at 364. The ***C.M.*** Court explained that a parent's parental duty includes, *inter alia*, (1) a positive duty of affirmative performance; (2) communication and association with the child; (3) exerted effort to take and maintain a place of importance in the child's life; and (4) exercising reasonable firmness in resisting obstacles placed in the path of the parent-child relationship. ***Id.***; ***see also In re Adoption of L.A.K.***, 265 A.3d 580, 592 (Pa. 2021) (defining "parental duties" as requiring a parent to provide "love, protection, guidance[,] and support" to the child). Obstacles preventing a parent-child relationship include, *inter alia*, "substance abuse, mental health issues, homelessness, joblessness, criminal charges, or a confluence of some or all of these issues[.]" ***L.A.K.***, 265 A.3d at 593.

> [E]ven where the evidence clearly establishes a parent [] failed to perform affirmative parental duties for a period in excess of six months, the [trial] court must examine the individual circumstances and any explanation offered by the parent to determine if that evidence, in light of the totality of circumstances, clearly warrants permitting the involuntary termination of parental rights.

*C.M.*, 255 A.3d at 364 (citation, quotation marks, and original brackets omitted); *see also L.A.K.*, 265 A.3d at 593. In considering the totality of the circumstances,

> if competent evidence establishes the statutory criteria under [Section] 2511(a)(1), [a trial court is required to consider] three lines of inquiry: (1) the parent's explanation for his or her absence; (2) the post-abandonment contact between parent and child, including a parent's efforts to re-establish contact; and (3) consideration of the effect of termination of parental rights on the child pursuant to [Section] 2511(b).

*C.M.*, 255 A.3d at 365; *see also L.A.K.*, 265 A.3d at 593.

> [A] finding of abandonment, which has been characterized as one of the most severe steps the [trial] court can take, will not be predicated upon parental conduct which is reasonably explained or which resulted from circumstances beyond the parent's control. It may only result when a parent has failed to utilize all available resources to preserve the parental relationship.

*L.A.K.*, 265 A.3d at 592 (citations, quotation marks, and original brackets omitted); *see also C.M.*, 255 A.3d at 365. "[T]he focus under [Section] 2511(a)(1) is not the degree of success a parent may have had in reaching the child, but examines whether, under the circumstances, the parent [] utilized all available resources to preserve the parent-child relationship." *C.M.*, 255 A.3d at 365.

Once the trial court determines that involuntary termination of parental rights is warranted under Section 2511(a), the trial court is required to engage in an analysis pursuant to Section 2511(b) to determine whether termination is in the best interests of the child. Section 2511(b) states,

## § 2511.  Grounds for involuntary termination

. . .

**(b)** **Other considerations.** - The court in terminating the rights of a parent shall give primary consideration to the developmental, physical[,] and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing[,] and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).  The analysis under Section 2511(b)

focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child.  As this Court has explained, [Section] 2511(b) does not explicitly require a bonding analysis and the term "bond" is not defined in the Adoption Act.  Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis.  While a parent's emotional bond with his or her child is a major aspect of the [Section] 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the [trial] court when determining what is in the best interest of the child.

In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of J.N.M.*, 177 A.3d 937, 943-944 (Pa. Super. 2018) (citation

and original brackets omitted), *appeal denied*, 183 A.3d 979 (Pa. 2018).  A

trial court may rely on a caseworker or social worker to determine the status of and nature of a parent-child bond. *J.N.M.*, 177 A.3d at 944 (holding, a trial court "is not required by statute or precedent to order a formal bonding evaluation be performed by an expert" (citation omitted)); *see also In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (holding, a trial court must "discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond" (citation omitted)).

Here, as noted *supra*, Mother sought involuntary termination of Father's parental rights pursuant to Section 2511(a)(1) and (b). In denying Mother's petitions, the trial court made the following findings of fact:

> [Mother] provided the history of the relationship between the parties and the relationship between [Father] and the children. She testified that domestic violence played a part in their lives with [Father] strangling [Mother] when she was nine months pregnant with the parties['] youngest child. Throughout the relationship, [Father] was physically and verbally abusive, for example, breaking [Mother's] nose and flipping a cigarette at her in front of the children. During the five to six year relationship, [Mother] was repeatedly struck by [Father]. Father's criminal history began in 2009 prior to [the birth of TR.H.B., the couple's eldest child]. Mother was aware of [Father's criminal] history.
>
> The parents resided together with the children. Mother was responsible for the children's medical care, schoolwork, emotional needs[,] and general welfare without assistance from [Father]. The parties separated in 2014[,] and [Father] exercised periods of partial custody and/or visitation without the benefit of a court order. Father had inconsistent contact with the children, visiting one to two times per week with lapses of weeks and months. Father was incarcerated in 2014[,] in Blair County prison for [11½] months after the birth of [T.H.B.] During his incarceration, he maintained contact with the children through the Children's

First Prison Program. Mother facilitated the continuing contact. Father visited with the children until 2017[,] without a court order by appearing at [Mother's] residence and spending time with the children in the community. In 2017, [Father] was incarcerated for six months. [During that period of incarceration,] Father had one telephone call with [T.R.B.] from the jail.

Father visited with the children on July 26, 2018, September 16, 2018, October 23, 2019, and December 2, 2019. He called on July 14, 2018, August 10, 2018, September 3, 2018, December 25, 2018, January 3, 2019, March 3, 2019, June 6, 2019, June 10, 2019, June 16, 2019, August 17, 2019, August 26, 2019, September 12, 2019, September 14, 2019, November 28, 2019, January 26, 2020, February 26, 2020[,] and February 28, 2020. Mother observed that [T.R.B.] became extremely anxious prior to visits with [Father]. This anxiety has persisted through the current court proceedings.

[On] September 23, 2020, [Father's] periods of partial custody were suspended pending [Father] being able to provide the [trial] court with a valid address. [The trial court subsequently noted that Father previously] provided his address . . . as set forth in the consent agreement [that was filed as an order of court on September 4, 2023.[5]]

[Mother] and [Stepfather] became a committed couple in 2017. [Stepfather] was faced with the prospect of raising not only his own three[-]year[-]old [child] but also [the children, who at the time were all under the age of seven. Stepfather] noted that [Father] had limited involvement [with the children. Stepfather] wanted to help and tried to get [Father] more involved after his release from incarceration. [Stepfather sent electronic textual messages to Father,] as well as assist[ed] him in repairing his vehicle to transport the children. In 2019 and 2020, [Stepfather] continued to arrange [parental visits between Father and the children,] but [Father] did not show up. [Stepfather] made excuses for [Father,] and the children would spend the day with him at his auto repair garage. On one occasion, [Stepfather]

_____

[5] The trial court stated that Father provided his address on September 4, 2020, which was **before** the trial court suspended Father's partial custody, on September 23, 2020, for failure to provide a valid address. Trial Court Opinion, 12/15/23, at 2, 13.

observed [Father] parked outside the residence and approached him. Father explained that he was visiting other neighbors on the [same] street but did not inquire about the children.

[Mother and Stepfather] created a blended family unit with [the children and Stepfather's child. Mother and Father] chose to give the children [Father's surname]. The blended family included [Stepfather's child] from a prior relationship. [Stepfather and his child's biological mother] chose to give [their child Stepfather's surname. Mother and Stepfather] have one child of their union[,] and they chose to give [that child Stepfather's surname. Stepfather's child] from his [prior] relationship is the step-sibling of the three subject children and half[-]brother of the youngest child.

[Stepfather] has been in the role of "father." He treats his own [children] the same as the [three] subject [] children. He taught them to ride [] bike[s], play sports, and general life skills. As a family, the bond [between Stepfather and the children] grew with a lifestyle that included family dinners, spending time together, and financial and emotional support. [Stepfather] coached the children in baseball, football[,] and soccer and is supportive of sports generally. He estimated for the past year and a half, [Father] has not been involved in the children's lives. In his opinion, you cannot force someone to make the effort. [Stepfather] loves the children and filled the void [created by Father's absence].

Father participated in an intake conference on June 20, 2021[,] and a conciliation conference on July 20, 2021. In 2021, Father's girlfriend [] supervised three to four visits [between Father and the children]. Father exercised his last custody visit on September 5, 2021.

Mother testified that during the summer baseball season of 2021, Father showed up at a baseball game and talked with the children. [T.R.B.] did not want to go for a walk with [Father]. One of the children accepted money [from Father] for the concession stand.

On September 28, 2021, [Father's sister] became the third[-]party supervisor [of Father's visitation with the children.[6]]. She has known [Mother] since [Father's sister] was 16 years old. She and her daughter babysat the three children for [Mother and Father]. Although [Father's sister] offered to assist and coordinate visits, her availability was restricted by her employment and Sunday work schedule. She had the ability to communicate with [Mother] on [a social media] messenger [application] but found that all attempts at scheduling were met with resistance. She continued to reach out on Friday for Sunday visits and offer[ed] her home as a visit[ation] location. Upon [Father's] consistent requests, [Father's sister] called [Mother on the telephone]. On October 1, 2021, [Father's sister] contacted [Mother] and asked where she could pick up the children. The [electronic textual message] response by [Mother did] not include a location. However, [Mother] wanted to know where the visits would take place. [Father's sister] responded that they would take [the children] to do things. Mother's response was that she was not comfortable with that answer, [stating,] "tell [Father] since he can't give me a location then to have one on his next Sunday." On Friday, October 15, 2021, [Father's sister sent Mother an electronic textual message] stating, "I just want to let you know I am not working Sunday [and] we will be coming to my house." [Mother did not respond.] On Wednesday, January 12, 2022, [Father's sister sent Mother an electronic textual message stating, "Father] wanted me to reach out and ask about getting the [children] this weekend." There was no response from [Mother]. On Friday, March 4, 2022, [Father's sister sent Mother an electronic textual message stating, "Father] wants to know if he can have a schedule of the [children's] sports dates and times." Mother's response was "their sports season is over." On March 4, 2022, [Father's sister] asked, "are [the children] available for a visit Sunday by chance[,] thank you?" [Mother did not respond.] Mother testified that she did not respond to [Father's sister's] requests because [the sister] was not in compliance with the court order which directed her to make arrangements on the Friday before the Sunday visit. [Father's sister] has never successfully

_____

[6] As discussed *infra*, a protection from abuse ("PFA") order filed against Father by Mother necessitated a third-party visitation coordinator and the custody order required Father's visitation to be supervised by a third-party. **See** Trial Court Opinion, 12/15/23, at 2.

arranged a supervised visit[,] and no Sunday visits were scheduled. Mother testified that she would have complied with the court order if [Father's sister] had followed through. Mother explained that she did not provide the children's sports schedule or information about school because [Father and Father's sister] did not ask. Nevertheless, [Father] was present at [the children's] sporting events due to [the] participation by his girlfriend's children.

Mother testified that [Father] was rude and aggressive toward [Stepfather] at an incident that occurred at [a high school] wrestling match in January [] 2023. [Stepfather] was assisting with the children's participation in the sport. Father testified that he was attempting to talk to the children. Mother testified that [Father] was acting aggressively toward [Stepfather. Father] was removed by [school] security from the gym[nasium]. The backlash required [Mother and Stepfather] to comfort [T.R.B.] and assure [TR.H.B. and T.H.B.] There was no police involvement nor was an indirect criminal contempt filed [against Father.] The incident was the basis for the extension of the PFA [order].

Mother testified that the children are no longer excited to see [Father] as they were when they were younger and do not ask about him. Mother is concerned that [Father's] continued participation in their lives will leave them emotionally damaged[,] and she is seeking the [involuntary] termination of [Father's] parental rights to facilitate a family unit. [The children] call [Stepfather] "dad" and go to him for all of their needs[,] including emotional support. [T.H.B.] only knows [Stepfather] as dad. [T.R.B.] wants [Stepfather's] attention all the time. Mother testified that [Father] told the children that [Stepfather] is not their "real dad."

Father argues that since the date of the parent's separation, [Mother] has obstructed his contact with the children. First, the PFA [order] prohibited communication between the parents. A custody visitation order was established which provided [Father] supervised visits only. Difficulties arose with third[-]party involvement and the parent's inability to coordinate through a third party. The order dated September 28, 2021[,] provided [Father] with visitation [on] Sundays from 3:00 p.m. to 7:00 p.m.[,] with [Father's sister] as the [coordinator] and supervisor. [Father's sister] testified that she tried many times to schedule visits and the requests were constantly denied for such

- 15 -

reasons as "[the children] have plans[,"] or "we are on vacation[,"] or "they have sports."

Mother has resided at the same address and has had the same [landline] telephone number, cell[ular tele]phone number[,] and [social media account] since September 5, 2021[,] and prior thereto. Father has not acknowledged the children's birthdays, Christmas[,] or other holidays and significant events in their lives since prior to September 2021. As of September 5, 2021, [Father] has not exercised any parental duties, has not supported the children financially, has not participated in their school or education, and has not provided any care including shelter or food.

Trial Court Opinion, 12/15/23, at 11-19 (record citations and extraneous capitalization omitted).

In challenging the trial court's order denying her petitions for involuntary termination of Father's parental rights, Mother contends that "sporadic attempts at contact with the children and [the filing of] a single custody petition days prior to [Mother's petition for involuntary] termination [of parental rights] does not constitute a reasonable effort to overcome any obstacle in maintaining the parent-child relationship." Mother's Brief at 30-31. Mother asserts that the "trial court acknowledged Father [] failed to perform essential parental care for the children" and "on cross-examination[,] Father also admitted that he had not performed any parental duties in the [six] months prior to the filing of the [petitions for involuntary termination of parental rights]." *Id.* at 26, 31. Mother argues that the trial court, nonetheless, relied on Father's one act of filing a petition for custody to deny the petitions for involuntary termination of parental rights. *Id.* at 31. Mother asserts that the trial court's rationale for denying her petitions for involuntary

termination of Father's parental rights "would mean that one action taken by a parent over an extended period of time would render [Section] 2511(a)(1) null and void." *Id.* at 32. Mother argues that "a single custody petition filed after [sixteen] months of no contact between Father and the children [does] not invalidate the whole history of this case and the failure of Father to perform parental duties for the six months preceding the filing of the [petitions for involuntary termination of parental rights]." *Id.* at 37.

Upon hearing the testimony and evidence presented at the termination hearing, the trial court explained its rationale for denying Mother's petitions as follows:

> In the case at bar, the evidence established that [Father] sporadically attempted contact and sporadically pursued the legal avenues available to him.
>
> A parent must exhibit reasonable firmness in attempting to overcome the barriers or obstructive behavior of others. The PFA order restricted contact between the parties commencing May 2020. The parties encountered difficulties utilizing third[-]party communicators.
>
> The children have a strong and loving bond with [Stepfather] and look to him as being their "dad" and father-figure. The relationship was established regardless of whether[, or not, Father] was a part of the children's lives. The denial of the [involuntary] termination of parental rights petitions will not have any impact on the children's relationship with [Stepfather].
>
> Addressing the merits of the petitions for involuntary termination of parental rights[,] and after consideration of the evidentiary record, the [trial] court believes that [Mother has] not proven to the [trial] court, by clear and convincing evidence, that [the] petitions for involuntary termination of parental rights should be granted pursuant to [Section] 2511(a)(1). The [trial] court finds that custody litigation has been ongoing since 2019. Multiple pleadings were filed and hearings held in 2020 and 2021. A time

- 17 -

lapse is reflected in 2022[,] with neither party pursuing any legal remedies. Early 2023 brought the multiple filings in the custody action followed by the petitions for [involuntary] termination of parental rights. There is no dispute that [Father] did not provide essential parental care, control, or subsistence during the period on which he was participating in the custody process.

The testimony focused on the period from August 14, 2022[,] to February 14, 2023, the six months preceding the filing of the involuntary termination [of parental rights] petitions. The [trial] court cannot ignore that [Father] pursued legal remedies two weeks and three days prior to the filing[. S]pecifically, on January 27, 2023[, Father] filed a petition for custody contempt. [Father] established that he filed a custody petition within the 6 months preceding the petitions for involuntary termination. Mother filed a custody petition simultaneously with the petitions for involuntary termination. The [trial] court must find that [Father] acted affirmatively with good faith, interest[,] and effort to maintain the parent[-]child relationship under the difficult circumstances.

Trial Court Opinion, 12/15/23, at 20-22 (citation and extraneous capitalization omitted).

Here, a review of the record demonstrates that Father's last visit with the children occurred on September 5, 2021. N.T., 6/30/23, at 4; *see also* N.T., 9/26/23, at 16. Mother testified that Father did not "perform any parental duties on behalf of the children" from September 2021, through February 14, 2023, when Mother filed her petitions for involuntary termination of Father's parental rights. N.T., 6/30/23, at 5. By way of example, Mother stated that Father did not support the children in their educational process, such as helping them with their homework, and Father was not involved in the children's schooling by attending parent-teacher conferences. *Id.* Mother further explained that Father did not provide the children meals or shelter

during the six months prior to the filing of the involuntary termination petitions. *Id.* at 5-6. Father agreed that during 2022, which included a portion of the six-month look-back period (August 14, 2022, to February 14, 2023), he did not provide the children meals or financial assistance, and he did not attend such things as doctor appointments and parent-teacher conferences. *Id.* at 22-23. Father further agreed that during the look-back period, he did not provide the children with any gifts or cards acknowledging holidays (*i.e.*, Christmas) or their birthdays. *Id.* at 33. As such, we concur with the trial court, and the record supports, that Father refused or failed to perform his parental duties towards the children for a period of at least six months prior to the filing of Mother's petitions for involuntary termination of Father's parental rights.

Upon finding that Father failed to perform his parental duties, the trial court examined Father's individual circumstances and his explanations for failing to perform his parental duties and, ultimately, determined that the evidence, in light of the totality of the circumstances, did not warrant involuntary termination of his parental rights. We agree.

Foremost, the record demonstrates that Father has a criminal history, which involved periods of incarceration (*see* N.T., 9/26/23, at 25-26), and that Mother had, and currently has, a PFA order against Father which restricts

and prohibits his interaction with Mother.[7]  *Id.* at 34-35; *see also* N.T., 6/30/23, at 6-7, 16-17.  The custody order that is currently in place provides Father with only limited physical custody of the children for four hours on certain Sundays.[8]  Further, Father's visitation must be supervised by a third-party.  As stated previously, Father's last visitation with the children was on September 5, 2021, which was around the time when Father's relationship with his then-girlfriend, who served as the third-party visitation coordinator and supervisor, ended.  N.T., 9/26/23, at 16, 26-27, 37-38.  Later that same month (September 2021), the trial court appointed Father's sister to act as the third-party visitation coordinator and supervisor.  *Id.* at 3; *see also* N.T., 6/30/23, at 9.  Father's sister testified that since being appointed as the third-party visitation supervisor, she has not been able to successfully arrange any visitations between Father and the children.[9]  N.T., 9/26/23, at 3, *see*

_____

[7] Records or evidence pertaining to Father's past criminal history or the PFA matter are not part of the current certified record.  The trial court noted that the PFA order "directed that the parents could not contact each other directly but could communicate regarding custody through [a third-party.]"  Trial Court Opinion, 12/15/23, at 2.

[8] The trial court described the current custody arrangements as affording Father "visitation with the children every other Sunday from 3:00 p.m. to 7:00 p.m."  Trial Court Opinion, 12/15/23, at 3.

[9] A copy of the court order detailing the parameters of Father's visitations with the children is not part of the certified record before us.  Mother's counsel represented to the trial court that the custody order required Father's sister to contact Mother "on Friday before [Father's] scheduled Sunday [visit] to advise [Mother] if the visit was able to occur and where the visit was to take place."  N.T., 6/30/23, at 9.  Father's sister testified that visitation had to be

- 20 -

*also* N.T., 6/30/23, at 9. The sister explained that "any time I contacted [Mother regarding] visitation with the [children,] there's either been no response or [Mother provided] a reason[] why the [children] couldn't partake in the visitation." N.T., 9/26/23, at 3; *see also* N.T., 6/30/23, at 24. The sister further explained that Father "was actively trying to visit the children," and he "was consistent" in asking her to reach out to Mother to arrange visitation. N.T., 9/26/23, at 4, 8. Mother countered by stating that Father's sister failed to comply with the Friday deadline for arranging visitation and that sister's correspondence failed to disclose the location of the visitation as required by the custody order. N.T., 6/30/23, at 10-11. Mother stated that she would have followed through with arranging visitation if Father's sister had complied with the custody order. *Id.* at 22. Father's sister explained that upon her designation as visitation coordinator and supervisor, she was

---

scheduled on Friday and would take place on the following Sunday. N.T., 9/26/23, at 11. The sister further testified that Father was not granted visitation rights for every Sunday. *Id.*

The trial court described the September 28, 2021 custody order as providing Father "with supervised visits every other Sunday from 3:00 p.m. to 7:00 p.m. beginning October 3, 2021." Trial Court Opinion, 12/15/23, at 3. The trial court further explained that the custody order provided that,

> [t]hese visits were to be supervised by [Father's sister] as long as she was able. [Father's sister] was to contact [Mother] on the Friday before [Father's] scheduled Sunday to advise [Mother] if the visit was able to occur and where the visit was to take place.

*Id.* at 3-4.

unaware that the correspondence with Mother needed to include a specific location where the visit would take place but once she became aware of this requirement, she complied. N.T., 9/26/23, at 4, 10.

Father explained that he filed a petition for contempt of the custody order against Mother in January 2023, because he "wasn't getting scheduled visits [with the children] which were agreed upon" and he was "trying to go through the proper channels to correct [the] matter[.]"[10] N.T., 9/26/23, at 16, 18. Father stated that during his four-hour visitation sessions with the children on certain Sundays, he did perform parental duties such as providing meals to the children. *Id.* at 21. Father further testified that he was unable to attend certain events with the children, such as the children's sports competitions, because Mother failed to provide the children's sports schedules, as required by court order.[11] *Id.* at 17, 28-29. Father also did not attend the children's doctor appointments or parent-teacher conferences because information about the events was not provided to him. *Id.* at 23. Mother testified that she never provided Father with the sports schedules because

---

[10] Prior to the filing of Father's petition for contempt of the custody order, Mother did not discuss with Father her plans to seek involuntary termination of Father's parental rights or her related petitions for adoption of the children. N.T., 6/30/23, at 29. As noted by the trial court, Mother's petitions for involuntary termination of Father's parental rights were filed on the date set for the hearing on Father's petition for contempt of the custody order. Trial Court Opinion, 12/15/23, at 5.

[11] The trial court noted that the September 28, 2021 agreed-upon custody order required Mother to provide Father *via* Father's sister the children's football schedules.

Father's sister never asked. N.T., 6/30/23, at 25-27. Father testified that even when he was incarcerated previously, he maintained contact with the children through various prison programs. N.T., 9/26/13, at 25-26. Father also explained that he did not send the children gifts or cards for holidays and birthdays because he was afraid his actions would violate the PFA order, which would also trigger a parole violation given Father's criminal history. *Id.* at 33-35, 42. Father stated that, prior to the issuance of the PFA order, he provided gifts and cards to the children. *Id.* at 34.

Upon review, we concur with the trial court, and the record supports, that Father faced several obstacles in performing his parental rights, such that, involuntary termination of his parental rights was not warranted based upon the totality of the circumstances. It is well-settled that "[a] parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship." *In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied*, 872 A.2d 1200 (Pa. 2005). Moreover, we are cognizant that Section 2511(a)(a) "does not contain an 'extremely difficult time' exception" justifying a parent's neglect of his or her parental duties. *See In re S.S.W.*, 125 A.3d 413, 419 (Pa. Super. 2015) (Mundy, J. dissenting).[12] Nonetheless, it is within the trial court's discretion to determine what

_____

[12] At the time of her dissent in *S.S.W.*, *supra*, Justice Mundy of our Supreme Court was a judge on this Court.

constitutes a "barrier" in the context of Section 2511(a)(1) and, in appropriate instances, whether and how barriers may arise from a custodial parent's obstructive behavior. **L.A.K.**, 265 A.3d at 593. In the case *sub judice*, Father was faced with a limited partial custody order that allowed him only four hours of supervised visitation on certain Sundays, a PFA order that restricted Father's direct interaction with Mother, and potential legal jeopardy stemming from the fact that a violation of the PFA order could result in a parole violation.[13] Father's efforts to exercise his parental duties with the children were further hampered by the fact that he was unable to successfully arrange a visitation since September 2021, despite several attempts by the third-party coordinator and supervisor.

It is largely undisputed that, while custody litigation between the parties was ongoing, Father was not extensively involved in the children's daily activities such as education and athletics. During this time, it is also uncontested that Father contributed little toward essentials such as shelter, food, and financial support for the children. But these contentions only go so far under the present circumstances. During the relevant period, the parties actively contested their custody arrangement and the current terms of the

---

[13] We do not excuse Father from performance of his parental duties while under the restrictions of the PFA order and current custody order. Father is free to seek modification of one or both of the orders, and it is within the power of the trial court to modify such orders to facilitate a platform on which Father is able to better perform his parental duties. Father's action for contempt against Mother is an effort in achieving such modification, and we hope that this will lead to Father better performing his parental duties.

custody order, which permitted only a few hours of supervised visitation each month and restricted Father's ability to participate in the children's daily pursuits. We do not suggest reconsideration of the current custody order; instead, we simply conclude that the trial court acted within the bounds of its discretion when its analysis acknowledged the limiting constraints imposed by the parties' contested custody arrangement.

Without knowledge of Mother's plans, Father filed an action for contempt against Mother within the six-month period preceding Mother's termination petitions. Through this action, Father sought to rectify his situation, restore visitation with his children, and resume the exercise of his parental duties. As such, based upon the totality of the circumstances and the record before us, we cannot find that the trial court erred as a matter of law or abused its discretion in denying Mother's petitions for involuntary termination of Father's parental rights.

Order affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

6/28/2024